**1833.**

NOAH
*v.*
WEBB.

NOAH and another *vs.* WEBB and others.

A bond or agreement which creates a partial or particular restraint of trade is good, if founded upon an adequate consideration ; and a specific performance will be decreed.

Where N. sells out a newspaper establishment to W. and T. and by bond and covenant stipulates not to set up another paper within a certain time and distance, and N. afterwards buys T's. moiety and becomes joint proprietor with W.: the remedy at law against N. upon the bond and covenant is gone.

Bonds and covenants which have been fairly made and are founded upon sufficient consideration, but have become defective or unavailable at law, will be sustained in equity.

A party who claims to have a bond or covenant given up, should clearly show, not only that the instrument is void in law and can never be enforced, but also that in equity it never ought to be made use of or enforced.

*April 22,*
**1833.**

*Bond. Covenant. Legal remedy gone upon a valid bond. Restraints upon trade.*

The motive for this bill was to have a bond given up, which it was alleged had become inoperative.

On the twentieth day of May one thousand eight hundred and twenty nine, the complainant Mordecai M. Noah was the sole proprietor of a newspaper in the city of New York called " The New York Enquirer;" and on the same day he sold the whole establishment to the defendants, James Watson Webb and Daniel E. Tylee, for the sum of thirty-five thousand dollars. The object of the purchase was to unite The New York Enquirer with " The Morning Courier" which belonged to Mr. Webb, and so as to have one paper published under the style of " The Morning Courier and New York Enquirer ;" and of which the defendants James Watson Webb and Daniel E. Tylee were to be joint proprietors.

In the bill of sale of the establishment of The New York 1832. Enquirer, which the complainant executed to these defendants, the following covenants on the part of the complainant Mordecai M. Noah were contained : " And further, that I the " said party of the first part shall not, nor will I, within . " the period of eight years next following the date hereof " connect myself with or lend my name to or directly or indi- " rectly write (except in defence of myself, if attacked) for " any newspaper or periodical now or at any time hereafter, " within the said period of eight years, to be published or estab- " lished in the city of New York or in the city of Albany or " within eighty miles of the said city of New York, except for " the Morning Courier and New York Enquirer as now pro- " posed to be united, without the consent in writing of the said " parties of the second part their executors, administrators or " assigns. And further that I, the said party of the first part, " shall and will endeavour, in good faith, to sustain and increase " the pecuniary prosperity and increased circulation of the pro- " posed newspaper intended to be conducted by the said par- " ties of the second part or their representatives *or assigns* " under the name of The Morning Courier and New York " Enquirer during its continuance or under such other name " as the said parties of the second part may hereafter see fit " to adopt for said paper."

Simultaneously with the bill of sale, Mr. Noah and his co-complainant Daniel Jackson executed to the defendants James Watson Webb and Daniel E. Tylee, as joint obligees, a bond in the penal sum of twenty thousand dollars. It recited the giving of the bill of sale and the covenant against Mr. Noah's publishing or being concerned in any other paper ; and the condition of it was an echo of such covenant.

Messrs Webb and Tylee were equal and joint proprietors of The Morning Courier and New York Enquirer until the second day of April one thousand eight hundred and thirty-one ; when Mr. Tylee sold out his moiety to Mr. Noah for the sum of twenty thousand dollars and executed a bill of sale to him for the same. Mr. Noah thereby became jointly inter-

NOAH
*v.*
WEBB.

1833.

NOAH
v.
WEBB.

ested with Mr. James Watson Webb, in the place of Mr. Tylee, in every part of this last mentioned newspaper establishment ; and they entered into an agreement as to the mode of conducting the concern and stipulated to participate alike in profits and bear the losses equally.

In order to secure fifteen thousand dollars of the purchase money, payable by instalments, the complainant Noah executed to the defendant Tylee (at the time the latter executed the bill of sale to the former) a bond, with a mortgage upon the undivided half of the establishment. This bond and mortgage were still in the hands of Mr. Tylee and in full force—some of the instalments not having become due.

In the month of August one thousand eight hundred and thirty-two another change in the concern took place. Mr. Noah sold out and conveyed the moiety he had purchased of Mr. Tylee to Mr. Webb, who thereby became the sole proprietor—subject to the mortgage held by Tylee.

On the eighth day of December in the same year James Watson Webb assigned the whole establishment of The Morning Courier and New York Enquirer to Daniel E. Tylee and Stephen H. Webb, in trust for the benefit of creditors. The mortgage debt to Mr. Tylee was recognized in the assignment as one which was to be paid out of the property : but all his rights were expressly reserved to him.

The covenant on the part of Mr. Noah to refrain for eight years from connecting himself with a newspaper as aforesaid and his bond in relation to the same had never become forfeited. But the complainant Mordecai M. Noah was desirous of resuming his editorial labours and of establishing a public journal in the city of New York. He claimed a right to do so, although the eight years had not elapsed.

The object of the bill filed in this suit was not to obtain relief from a breach or forfeiture already incurred, but to compel a surrender and cancellation of the bond and covenant, in order that no question of breach or forfeiture might afterwards arise. The complainants were apprehensive that attempts might be made to enforce it ; and so long as it remained un-

cancelled, they alleged it to be injurious to their credit and a source of inconvenience and anxiety to the surety. It proceeded mainly upon the ground of the bond's having ceased to be of any avail to the defendants and that it was no longer of any binding force upon the complainants as obligors : because of the subsequent changes which had taken place in the ownership of the newspaper to which it related and more especially since Mr. Noah was admitted a co-proprietor with one of the obligees under a purchase from the other. The bill alleged, that it was merely through inadvertence the bond was not cancelled at the time of Mr. Noah's joint ownership with Mr. Webb ; and that the surety had not required it, because he considered it was virtually at an end, and supposed no attempt would be made to put it in force.

The answer of the defendants Stephen H. Webb and Daniel E. Tylee did not admit any rights in the complainants to have the bond cancelled ; and denied that it would have been given up if the same had been applied for while Mr. Noah was the part owner. The assignees insisted upon holding the bond, with the benefit of the restraint which it imposed, inasmuch as it constituted a part of the good will belonging to the establishment, which had been considered as matter of sale and assignment, and because of its enhancing, in some measure, the value of such good will. And these defendants insisted, that the establishment would be injured, if the defendant, Mordecai M. Noah, were allowed to set up or edit another paper within the prescribed limits. The assignees, moreover, submitted themselves to the discretion of the court.

The defendant James Watson Webb, in his answer, said that, so far as he had any right, he consented to Mr. Noah's being released from the bond and covenant : although he did not admit his right to claim such release or pretend that he (the defendant answering) had any authority to give such consent.

Mr. *R. Sedgwick,* for the complainants.

1833.

WEBB
v.
NOAH.

May 6.

Mr. *C. Edwards*, for the defendants Stephen H. Webb and Daniel E. Tylee.

The defendant *James Watson Webb* in person.

THE VICE-CHANCELLOR. The power of this court to compel bonds and other instruments in the nature of securities to be given up and cancelled is not to be disputed. And in the exercise of this power, so far as the point of jurisdiction is concerned, it matters not whether such instrument could or could not be enforced at law, nor whether it is void upon its face or shown to be void by evidence *aliunde*. Still, the power will not be exercised in every case of the kind. It rests in sound discretion. Before a bill for cancelling an instrument in such cases will be sustained, the filing of it must appear, from the particular facts and circumstances of the case, to have been expedient and proper. The case of *Hamilton* v. *Cummings*, 1 *J. C. R.* 517. contains a clear exposition of the principles by which this court is governed on the subject.

The questions which seem naturally to present themselves in the present case are these : 1. Is this bond void upon the face of it as being against public policy ? 2. Is it a bond which has ceased to be of any force or obligation by events occurring subsequent to its execution ? And, if either of these questions should be determined in the affirmative, then, 3. Is there enough to warrant the relief which the bill seeks to obtain ?

I. The first question has been raised in argument. But the bill does not attempt to claim relief upon the ground of the bonds being originally void. I shall, nevertheless, proceed to examine it very briefly.

It is undoubtedly the policy of the law not to permit persons to be placed under general restraints of trade, even by their own acts or agreements, although the same may be founded upon a valuable consideration. Still, an agreement which creates only a partial or particular restraint, is valid, if entered into upon a good and adequate consideration. The law on this subject, as applicable to all cases of restraint, whether

arising from grant, custom, bye law or the acts or agreement of parties, was very clearly stated by Chief Justice *Parker*, (afterwards Lord Chancellor *Macclesfield*) in *Mitchell* v. *Reynolds*, in *B. R.* 1 *P. W.* 181. He there held, that a bond conditioned not to exercise a certain trade within a particular parish during the term of five years was good : it appearing by the recital in the bond, that the obligor had assigned to the obligee a lease of the premises where the obligor had previously carried on the business, which he stipulated not to follow in the same parish within a given time. Here was a sufficient consideration to support the bond ; and the restraint was a limited one.

In *Davis* v. *Mason*, 5 *T. R.* 118. Lord *Kenyon* considered the above case as settling the law ; and applied the same principle to a bond given by one surgeon to another, who, in consideration of being taken into business with the obligee as an assistant, bound himself not to exercise his professional skill and business on his own account within the distance of ten miles for the space of fourteen years. And this bond was also held to be a valid one.

The case of *Chessman* v. *Nainby*, 2 *Stra.* 739. *S. C.* 1 *Bro. P. C.* (*Toml. ed.*) 234, is to the same effect. There, a judgment of the common pleas in favor of the validity of a similar bond was affirmed by the king's bench as well as in parliament.

The court of chancery, acting upon the same principles, gives effect to agreements in restraint of a particular trade or business, where the same are founded upon a sufficient consideration ; and a specific performance will be decreed : *Bryson* v. *Whitehead*, 1 *Sim. & S.* 74.

This court also protects purchasers of the goodwill of a trade who have paid a valuable consideration for it against any interference of the vendor which may be contrary to good faith and the honest understanding of the parties, although there may be no bond or covenant to restrain them : *Harrison* v. *Gardner*, 2 *Madd.* 198 ; *Shackle* v. *Baker*, 14. *Ves.* 468 ; and *Crutwell* v. *Lye*, 17. *Ib.* 336.

The present case seems to be very analogous to several of

77

those which I have referred to ; and, upon the same principles, it is manifest the bond in question was not void in its inception. It does not profess to restrain Mr. Noah generally from establishing another newspaper nor entirely from exercising his editorial talents. It only restrains him for a limited time and within a certain space ; and the consideration is to be found in the price given for the purchase of the newspaper and the good will of the establishment which evidently formed part of the contract and passed to the purchasers.) The price which was paid must be deemed to have been an adequate consideration for the whole until the contrary appears. I have no doubt upon this part of the case.

2. The next question depends upon the effect which Mr. Noah's repurchase had upon the bond and covenant. Upon its taking place, he entered into the possession as joint owner with Mr. Webb ; and became vested with all the rights of Mr. Tylee in every thing relating to the concern. The obligor thus succeeded to the rights of one of two joint obligees in the subject matter of the bond. I speak now of the legal operation of the bill of sale, laying out of view the mortgage given at the same time to secure the greater part of the purchase money. The latter circumstance, I apprehend, may make an essential difference in the view of a court of equity. Considering, then, Mr. Noah as the legal owner of a moiety in the place of Mr. Tylee, and in possession of all his rights and interests, it is very clear the effect of it defeats altogether any remedy at law, upon the covenant or bond, for any breach subsequently committed. No action could be brought upon either of those instruments, except in the joint names of the persons to whom they were given, so long as they should live. If the covenant were now broken or the condition of the bond no longer observed, and an action were brought, it would be liable to the objection that the obligees had no longer a joint interest : one of them having long before parted with his ownership in the subject matter and not being damnified by any acts which might be deemed a violation of the terms of those instruments. And should it be shown, for the purpose of obvi-

ᵃting this objection, that the action was brought by or in behalf of an assignee or assignees (and admitting that courts of law do protect the rights of assignees of *choses in action* and permit actions to be prosecuted for their benefit,) yet, any such assignee of this bond or covenant, in tracing his title, would be obliged to show it came through Mr. Noah himself, at least as to a moiety of which he was once the owner, and that too of a covenant made by himself and of a bond in which he was the principal obligor. When these facts were made to appear, there would be an end to the action. And when once the right of action upon the bond and covenant was suspended or gone, it would be gone for ever.

While Mr. Webb and Mr. Noah were joint proprietors, no such action could have been sustained : because the former could not have sued in his own name alone for the injury done to him individually. There could have been no such severance of the remedy. The contract was to two jointly. A suit in the names of both would, in effect, have been a suit as respects one party in interest against himself: an anomaly, indeed, an absurdity which the law cannot tolerate.

Here, then, was a complete suspension and, I may say, an extinguishment of the right of action at law : for it was not revived by Mr. Noah's selling out and Mr. Webb becoming the sole proprietor, although the bond remained uncancelled. A new obligation should have been required and given, in order to have preserved a legal remedy to the latter, provided the restraint was intended to be continued : and as Mr. Webb did not take this precaution, and as the present assignees, under the assignment from him, have no other rights or greater powers than he possessed, they cannot, by any possibility, resort to a legal remedy, should Mr. Noah now throw off the restraint and entirely disregard his previous stipulations.

There are other views which might be presented upon the principle of a class of cases where suits have been brought upon bonds of indemnity given to partners and a change of the parties in interest has taken place before forfeiture or breach and where the question has arisen, how far the bond

was available in favor of the new or succeeding parties : *See* 3 *Wils.* 530 ; 1 *T. R.* 287, 291 ; 12 *East.* 400. But it is unnecessary for me to examine the doctrine in those cases. The present appears to me very distinguishable, on the ground of Mr. Noah's becoming, as it were, a substituted obligee of the bond. This circumstance appears to create an insurmountable obstacle to the prosecution of any action at law ; and so far the bond has become unavailing.

3. But another important question remains ; ought the court therefore to interfere and decree a surrender of the bond ?

There are many cases in the books to show, that although the obligation and penalty are gone and the legal remedy is lost, yet, so far from ordering the bond to be given up, the condition of it will be regarded in the light of an agreement and its performance enforced. An examination of a few of the cases will sufficiently elucidate the principle upon which this court proceeds.

The case of *Acton* v. *Pierce*, 2 *Vern.* 480. *S. C. Prec. in Ch.* 237, may be regarded as the leading one. The bill was filed by the widow of John Acton against his heir and mortgagee to have the benefit of a bond out of his real estate. This bond had been executed to her previous to and in contemplation of her marriage with John Acton ; the condition of which was to leave her one thousand dollars if she survived him. Her claim was placed upon the ground that, although the bond was released or extinguished at law by the intermarriage, yet it subsisted not only as an agreement but as a specialty in equity and bound the real assets of the obligor. And it was so decreed by Lord Keeper *Wright*. The same bond had shortly before come in question in the court of king's bench, in an action against the widow as administratrix of her deceased husband, where she set up the right of retainer as a creditor by virtue of the bond ; and the question was, whether it was not discharged by intermarriage of the obligor and obligee ? The judges differed in opinion. *Holt, C. J.* appears to have considered the bond extinguished ; but the other two judges

held the contrary, saying, that as nothing was to be performed during the coverture and as the bond could not be forfeited so as to give a right of action until after the husband's death, the marriage was only a suspension and not an extinguishment of the debt. They took the distinction, (and which is clearly recognized in other cases) between a present contract creating an immediate liability and indebtedness or a duty which might accrue during the coverture and one entirely executory, intended to secure a debt or duty to accrue after the death of the husband. The first are discharged and extinguished by the marriage; while the latter are not: *Gage* v. *Acton*, 1 *Lord Raym*, 516; 1 *Comyn. R.* 67; 1 *Salk.* 325.

Whatever differences may have existed in the minds of those judges as to the effect of a marriage upon that species of bond and however well settled the law may have since become on the subject by the unanimous opinion of the court in *Melbourne* v. *Ewart*, 5 *T. R.* 881, it can make no difference in the principle upon which a court of chancery acts. This may be gathered from *Acton* v. *Pierce*: for there (as particularly reported in *Prec. in Ch.*) it is evident the decision proceeded upon the assumption, at least, that the effect of the marriage was to take away the remedy at law, since it was urged on the part of the heir that by the marriage the bond became void at law, and on the other, that although by the marriage it lost its force in point of law, yet, in equity, it would have the same power as before and bind the husband and it was to be considered in equity not only as an agreement in writing but as a bond which was binding upon the heir. And the Lord keeper was of the latter opinion.

The case of *Cannel* v. *Buckles*, 2 *P. W.* 242, before Lord *Macclesfield* about twenty years afterwards, was, to the same effect. A *feme sole* had given a bond in two hundred pounds to her intended husband, with a condition, in case the marriage took place, that she would convey all her lands to the husband and his heirs. They married. The wife and her issue died; and so did the husband afterwards. A bill was then brought by the heir of the husband against the heir of the wife to have

the lands conveyed ; and although the bond was admitted to be void in law upon the notion of the husband and wife being one person and he could never have sued her at law, yet the bond was held to be sufficient evidence of the agreement in equity and the marriage a valuable consideration to support it. A specific performance was decreed.

There are numerous other cases growing out of covenants and agreements entered into between husband and wife, without the intervention of trustees, where, although void in law or such as courts of law cannot recognize, the court of chancery has interposed its authority to enforce performance. Instances of this sort are to be found in *Haymer* v. *Haymer*, 2 *Vent.* 343 ; *Purson* v. *Fenton*, 1 *Vern.* 408 ; and *Harvey* v. *Harvey*, 1 *P. W.* 125. But I have not met with any case where this court has refused to interfere and decree performance ; or where it has directed a bond or covenant to be given up, if the same has been fairly entered into and upon a sufficient consideration.

There is another class of cases to which I would refer ; where bonds or covenants which have become defective or void in law are aided in equity. Thus, a bond given by two, binding themselves jointly and not severally. One dies ; and the surviving obligor afterwards becomes bankrupt. Here, because the parties were not bound severally as well as jointly, there is no legal remedy against the representatives of the deceased obligor. The liability as to him ceased at his death, and the whole debt then devolved upon the survivor. And yet, as the money for which the bond was given had been borrowed by both of the obligors, equity holds them not only jointly but severally liable and considered they meant to be thus bound ; and, upon a bill filed by the obligee against the representatives of the deceased obligor to have satisfaction out of his estate equity will grant relief accordingly : *Bishop* v. *Church*, 2 *Ves. Sen'r.* 100, 371.

The ground on which the court assumes to act in such cases is, that of mistake in drawing the bond in this form ; and will, therefore, consider a joint bond given for a debt which was

contracted by two, a joint and several one : *Thomas* v. *Fraser*, 3 *Ves.* 399. But if there is no ground to infer mistake in the instrument, as, if one party is only a surety for the other in a bond or covenant for indemnity, the same will not be considered as joint and several, unless it be so expressed. The extent of it will be measured by the words which are used : *Sumner* v. *Powell*, 2 *Meriv.* 30 ; affirmed, 1 *Turn. & R.* 30.

In *Bishop* v. *Church, ante,* Lord *Hardwicke,* at page 373, refers to *Acton* v. *Peirce* and some other cases : and approves of the reason the court has gone upon, namely, that although the obligation and penalty of the bond may be gone at law, yet the condition is considered an agreement which is liable to be enforced in equity.

It is unnecessary for me to go further into the examination of cases on this subject. Those already adduced are sufficient to show, that the habit of this court is not to cancel bonds or other instruments because they have no validity as matters of legal obligation or cognizance. On the contrary, it is an essential part of equity jurisdiction, and which this court is constantly in the practice of exercising, to treat such instruments as agreements and lend its aid in enforcing them as such, wherever they appear to be fair in all respects and founded upon a sufficient consideration. Instances, however, may occur in which the court may be called upon to exert its authority in an opposite direction and order instruments of this kind to be given up and cancelled. But, the justice, propriety or necessity for the measure must be very apparent. The party claiming it should show clearly and beyond all reasonable doubt not only that the instrument is void in law and can never be enforced there, but that in equity also it never ought to be enforced or attempted to be made use of for any purpose against him. These, I am satisfied, are the only safe rules for the government of this court in the exercise of this very important part of its jurisdiction.

The case before me is not brought within them : for, although no action at law can, in my opinion, be sustained upon either the bond or the covenant for any thing Mr. Noah may

choose to do, still, I am by no means certain an application to this court would not be sustained in behalf of the assignees to compel him individually to observe the condition of his bond and the terms of his covenant and restrain him from doing any act in violation of them. The assignment from James Watson Webb to the defendants Stephen H. Webb and Daniel E. Tylee is very broad and comprehensive. It appears to have been intended to pass every thing constituting the newspaper establishment as well as any collateral and incidental rights which Mr. Webb might have had.

There is one other consideration which I cannot but think must in equity have some weight and influence in this view of the subject. I refer to the mortgage to Mr. Tylee; and which he still holds unsatisfied. It appears to me, a strong equity arises as between him and Mr. Noah, to the effect that nothing should be done by the latter to lessen in any way the value of the security, which there is reason to infer was accepted upon the faith of the restriction Mr. Noah was then under and which it may be supposed was intended to remain binding upon him until, at least, the mortgage was discharged. As mortgagee, for the purchase money, by a mortgage given at the same time with the bill of sale, he may be considered as retaining an equitable ownership in the establishment. How far these circumstances may be important upon an application for any injunction hereafter, if one should be made, I will not now determine. It is sufficient for me here to say, they have entered into the consideration of the case; and for the reasons I have attempted to assign, I am satisfied there is not enough to warrant me in granting the relief which is prayed for in the present bill.

The assignees ask, by their answer, for an injunction in this suit to restrain Mr. Noah from setting up or publishing any other newspaper pursuant to his bond and covenant. I shall not, however, undertake so to interfere upon the present pleadings. All I can do is to dismiss this bill, with costs.