FARMINGTON VILLAGE CORPORATION, in equity,

*vs.*

SANDY RIVER NATIONAL BANK, and others.

Franklin.    Opinion August 13, 1892.

*Equity.    Multiplicity of suits.    Cancellation.*

A bill in equity, in which an injunction is sought against numerous respondents, in a case where the rights of all depend upon identically the same question, both of law and fact, may be sustained upon the ground of the inherent jurisdiction of equity to interpose for the purpose of preventing a multiplicity of suits.

It is in the nature of a bill of peace, where, if entitled to relief, it may be sustained in order to prevent a multiplicity of suits by parties whose rights depend upon the same question involved in the general controversy.

This court, as a court of equity, in a proper case, has full power to order the cancellation of bonds or other written instruments.

But it is a power which the court in its discretion will exercise with care, and only in accordance with what it believes to be proper and right under the circumstances.

Nor will this power be exercised where the legal remedy, either affirmative or defensive, would be adequate, certain and complete.

And before this power will be exercised, it must be made to appear that a

necessity exists to prevent irreparable injury which a court of equity alone can avert.

See *Farmington Village Corporation* v. *Dyar*, 70 Maine, 515.

ON REPORT.

Bill in equity, heard on report to the full court upon bill, pleadings and proofs, to compel the surrender into court for cancellation of certain bonds and coupons issued by the complainant in aid of the construction of the Androscoggin railroad from West Farmington into Farmington Village in 1870-1.

A principal ground for relief was based by the complainant on its right of cancellation to prevent a multiplicity of suits. The first case in which litigation arose, out of the issue of the bonds, is *Dyar* v. *Farmington Village Corporation*, 70 Maine, 515.

The facts are stated in the opinion.

*J. C. Holman* and *W. L. Putnam*, for complainant.

*S. Clifford Belcher*, *H. L. Whitcomb*, *E. O. Greenleaf*, *A. F. Belcher*, and *George and Charles E. Wing*, for defendants.

FOSTER, J.  This is a bill in equity brought by the Farmington Village Corporation against sixty respondents, asking the court that they may be perpetually enjoined from negotiating or delivering to any person certain bonds and coupons issued by said corporation and owned by the respondents, and that the same shall be surrendered, cancelled and destroyed.

The amount of these bonds is $19,800, besides the semi-annual interest coupons thereon for more than nineteen years.

Considerable litigation having grown out of the issuing of these bonds, and the fact that the court is now asked to have them cancelled and destroyed, it may not be improper to give a brief history in relation to their issue, and of the litigation pertaining to them.

In 1869, the citizens of Farmington Village Corporation believing their interests were suffering from the fact that the railroad did not extend to their village, but terminated at West Farmington on the west side of Sandy River, about one mile distant, took action with a view of having the railroad extended

across the river to their village.   In order to accomplish this, it was thought expedient that the village corporation should bear a portion of the expense of this extension.   Inasmuch as it was believed that the village corporation had not power under its charter, to loan its credit, or negotiate in any way with the railroad company, application was made to the legislature for authority.   Accordingly, in 1870, an act was passed (Special Act, 1870, c. 292,) entitled "An act to authorize the Farmington Village Corporation to raise money to aid in the extension of the railroad terminating at Farmington, known as the Androscoggin Railroad, and to contract for said extension."   This act was approved February 1, 1870, and took effect on its approval.   By this act the corporation was authorized to raise by tax or loan such sums of money as the corporation might deem expedient, not exceeding thirty-five thousand dollars to aid in the extension.

At a legal meeting of the corporation held on February 21st, 1870, the citizens of the corporation voted to aid in the extension of the railroad, appropriated a sum not exceeding $35,000 for that purpose, chose a committee to contract with the railroad company for such extension, authorized the assessors and treasurer to issue the bonds of the corporation for a sum not exceeding the amount before named, and to deliver the same to their committee to be used in effecting such extension.

The committee on the 15th day of April, 1870, entered into a contract with the railroad company for the extension of the road.   The railroad company in compliance with its contract located and constructed the extension of its railroad, erected depots and other buildings within the limits of the village corporation, and in all respects fully performed its covenants and agreements in a reasonable time, the quarterly payments of $3750 each being made to the railroad company under its contract, as follows,— July 18th, August 24th and November 24th, 1870, and February 15, 1871.

The committee of the corporation disposed of the bonds placed in their hands to the amount of $19,800.   This sum represents the total amount of bonds sold and still outstanding against the corporation.

The following is a history of the litigation. On June 27, 1870, before the committee had received any of the bonds from the assessors and treasurer of the village corporation, and prior to July 1, 1870, on which day all the bonds bear date, a bill in equity was brought by Jonas Burnham and eleven others, all citizens, owners of property subject to taxation, and taxpayers in the village corporation, praying that the corporation should be enjoined from issuing the bonds, and that the committee should be enjoined from negotiating the same, and from carrying out the contract already entered into with the railroad company; and that the railroad company should be enjoined from enforcing its contract with the corporation. The land for the extension had already been taken, and the railroad company had expended $12,000, were bound by contracts to nearly $17,000, and had completed nearly one fourth of its work. A hearing was had on the bill and a temporary injunction denied. The case was then carried to the full court on an agreed statement, and on August 5th, 1872, the following decision was rendered: "Bill dismissed without prejudice," for the reason, as it is understood, that the statute in relation to proceedings in equity for relief in matters of this kind did not apply to village corporations.

In the mean time the extension had been completed, stations built, and the road been in operation for a year and a half. The bonds had all been negotiated except $2000.

Seven days after this decision was rendered,—August 12, 1872,—Joseph Dyar and thirteen others, all residents of the village corporation, tax payers in the corporation, and owners of property therein, brought another bill in equity, in all its essentials like the previous one which has been dismissed "without prejudice." Since the commencement of the first suit, the powers of the court, as a court of equity, had been enlarged by c. 29, Laws of 1872, which provided relief by injunction in favor of village corporations. To this bill the village corporation filed its answer, and the railroad company filed a demurrer. It was entered and heard at the July Law term,

1873, and continued for advisement. No. temporary injunction was issued in this suit.

At a legal meeting of the village corporation, held on the 27th day of January, 1872, and at another, held on the 28th day of September, 1872, the corporation voted to raise certain sums of money to meet the outstanding indebtedness of the corporation in relation to the coupons then over due.

After these meetings, on the 5th day of October, 1872, another bill in equity was filed by Joseph Dyar and sixteen others, residents and taxpayers, praying for an injunction to issue restraining the village corporation, the assessors, collector and treasurer, from assessing, collecting and receiving and paying out the tax so voted. To this last bill in which only the corporation and its officers were made defendants, a temporary injunction was granted, answers filed, and the case came on to be heard at the July Law term, 1873, the same term at which the preceding bill was heard. This case, like the other, was continued for advisement; and on the 27th day of August, 1878, decision was received and filed from the Law court in both suits, sustaining both bills, and granting the injunction prayed for in each case. The opinion of the court is found in 70 Maine, 515. The question there presented and which was considered and passed upon, was in relation to the constitutionality of the special act of the legislature, approved February 1, 1870, authorizing the village corporation to aid the extension of the railroad. The court held the act to be unconstitutional, and all parties were restrained from acting under it.

These decrees and decision in these several suits are the only judgments rendered by this court in relation to this controversy.

The question of the validity of these bonds has never been directly before this court.

In a suit brought in the circuit court of the United States for the district of Maine directly on the coupons, by a citizen of Massachusetts, at the September term, 1880, this question was directly in issue, and the court held the coupons valid, and rendered judgment for the amount sued. This judgment was afterwards reversed by the Supreme Court of the United States

upon the ground that the circuit court had no jurisdiction. *Farmington Village Corporation* v. *Pillsbury*, 114 U. S. 138.

Nothing was afterwards done by the holders of these securities either to enforce their collection or to dispose of them, until February, 1889, when some of the defendants in the present suit, determined to sell their bonds for what they could get, employed Dr. Parmenas Dyer to negotiate a sale of them. He went to Boston and there sold them for five per cent of their face value. Dyer had full authority to sell the bonds which had been entrusted to him for that purpose. He made sale, as his testimony shows, to a party by the name of Tingley. Suit was afterwards brought upon the bonds and coupons which Dyer had sold, in the circuit court of the United States, by one George G. Smith of Cambridge,— the writ bearing date March 21, 1889.

It is alleged that this transfer or sale was collusive, and made for the purpose of bringing another suit against this complainant corporation in the circuit court of the United States; that the sale was not made *bona fide*, but was collusive and fraudulent, and conveyed no title to Smith.

The evidence does not support this allegation, but, on the contrary, negatives any collusion or fraud on the part of the owners of the bonds who sold them for a very small per cent of their face value. If the sale was absolute and they parted with their entire interest in the bonds, it matters not what their purpose was in making the sale.

The bill, in this case, further sets out as one of the grounds for asking the relief prayed for, that there is a determination and expectation, on the part of the defendants, to make from time to time other collusive, fraudulent and apparent transfers of the bonds and coupons, or a part of them, with a view of bringing suits thereon in the names of different persons assuming to be the owners thereof, against the complainant, from time to time, for the purpose of harassing and vexing the complainant.

No evidence is offered in support of this allegation, and all the defendants who have answered deny such determination, arrangement or expectation. Not one of these defendants has

ever brought suit.   No evidence has been adduced that any of them has threatened or has any intention of bringing any suit. They deny it in their answers.   True, the defendants may sell their bonds, and suits be brought by other parties.   But these bonds have been issued twenty-one years ; coupons for the past nineteen years and the principal of fifty of these bonds have been due and payable for more than six years.   During all these years but two suits have been brought on all this overdue and dishonored paper.   During the same period, four suits in equity have been brought by those opposed to the payment of the bonds, to prevent their payment.

The bill also alleges that so long as these bonds and coupons are outstanding and uncancelled, being payable to bearer, and of great number, the complainant is subject to innumerable unjust suits in reference thereto, and to be vexed, harassed and put to great expense by reason of the multiplicity of suits, without just or lawful cause.

And the complainant, therefore, prays that the court by its decree shall order these securities to be delivered up and cancelled, claiming that the question depends entirely upon the constitutionality of the act to which we have referred, and the validity of the proceedings under the same, and upon the effect of the decision of this court in which that act was held to be unconstitutional.

One thing is certain, that these defendants paid the full face value of these bonds,— the community received the benefit of the extension, and that the money was honestly expended in the extension of the railroad to Farmington village.

A question that first arises in this case, before considering whether the court is authorized or ought to order the cancelation of the bonds, is whether this bill can be sustained against these numerous respondents, in case it is to be sustained upon other grounds, or whether a separate suit should be brought against them individually.

We have no doubt that, in a case like this, where the rights of all depend upon identically the same question, both of law and fact, the bill may be sustained upon the ground of the

inherent jurisdiction of equity to interpose for the purpose of preventing a multiplicity of suits. It is in the nature of a bill of peace, where, if the complainant is entitled to relief, it may be sustained in order to prevent a multiplicity of suits by parties whose rights depend upon the same question involved in the general controversy. In the development and growth of equity practice with reference to the number of parties may be cited the case of *Woodruff* v. *North Bloomfield Grand Mining Co.* 8 Sawyer, U. S. C. C. 628, where this principle was discussed by Sawyer, J., who said : "The rights of all involved depend upon identically the same question, both of law and fact. It is one of the class of cases, like bills of peace, and bills founded on analogous principles, where a single individual may bring a suit against numerous defendants, where there is no joint interest or title, but where the questions at issue and the evidence to establish the rights of the parties and the relief demanded are identical." Further discussion on this point is unnecessary inasmuch as this court in the recent cases of *Lockwood Co.* v. *Lawrence*, 77 Maine, 297, 305, 306, 307, 308, and *Carleton* v. *Newman*, *Id.* 408, has settled this doctrine of equity practice in this State. Other authorities to the same effect are : *Sheffield Waterworks* v. *Yeoman*, L. R. 2 Ch. App. 8, 12 ; *Brown* v. *Truesdale*, 138 U. S. 389 ; *Winsor* v. *Baily*, 55 N. H. 218, 221 ; Pom. Eq. § § 269, 1394.

Nor can there be any question that, in a proper case, this court has full power to order the cancellation of bonds or other written instruments. But it is not a matter of absolute right. It is a power which the court will exercise with care, and only in accordance with what it believes to be proper and right under the circumstances. It certainly will not exercise it where the legal remedy, either affirmative or defensive, would be adequate, certain and complete. Pom. Eq. § 914. And so it has been held that the mere fact that a defense exists as against a written instrument, or that evidence may be lost, is no ground for its cancellation. It must be shown that a necessity exists to prevent irreparable injury which a court of equity alone can avert. *Globe Mutual Life Ins. Co.* v. *Reals*, 79 N. Y. 202 ; *Venice* v.

*Woodruff*, 62 N. Y. 462 ; *Noah* v. *Webb*, 1 Edw. Ch. 604, 608, 615 ; *Shotwell* v. *Shotwell*, 24 N. J. Eq. 378.

In the case of *Noah* v. *Webb*, *supra*, it was held that before a bill for canceling an instrument will be sustained, it must appear from the particular facts and circumstances of the case to have been expedient and proper. The court there say : " The habit of this court is not to cancel bonds, or other instruments, because they have no validity as matters of legal obligation or cognizance. On the contrary, it is an essential part of equity jurisdiction, and which this court is constantly in the practice of exercising, to treat such instruments as agreements, and lend its aid in enforcing them as such, whenever they appear to be fair in all respects and founded on a sufficient consideration. Instances, however, may occur in which the court may be called upon to exert its authority in an opposite direction and order instruments of this kind to be given up and canceled. But the justice, propriety or necessity for the measure must be very apparent. The party claiming it should show clearly and beyond all reasonable doubt, not only that the instrument is void at law and can never be enforced there, but that in equity also it never ought to be enforced or attempted to be made use of for any purpose against him."

The case of *Venice* v. *Woodruff*, *supra*, was where an action was brought to have certain bonds, issued by the supervisor and railroad commissioners of the town of Venice, delivered up and cancelled, and to restrain defendants, the holders of said bonds, from transferring them. The court, after stating the general principles applicable to such cases, that the circumstances must be such that a resort to equity is necessary to prevent an injury which might be irreparable, say : " If the mere fact that a defense exists to a written instrument were sufficient to authorize an application to a court of equity to decree its surrender and cancellation, it is obvious that every controversy in which the claim of either party was evidenced by a writing could be drawn to the equity side of the court, and tried in the mode provided for the trial of equitable actions, instead of being disposed of in the ordinary manner by a jury.   .   .   .

"The real purpose of the litigation seems to be to prevent a resort to the courts of the United States for the collection of these bonds ; and the question is, whether it is the province of a court of equity in a state to interfere for the purpose of preventing a resort to the Federal courts for the enforcement of obligations on the ground that they may be held in those courts to be valid, while, according to the decisions of the state courts, the same obligations are held to be void.    I apprehend that the power of a court of equity to decree the surrender and cancellation of instruments has never before been appealed to or exercised for such a purpose.    Equity will interfere to control the actions of parties, and restrain them from transferring negotiable obligations, on the ground that it is against conscience to allow them to create in their transferee a right or equity which they themselves do not possess.    But where the effect of the transfer is not to change in any respect the rights or equities of the parties, I am not prepared to hold that the allegation that the transferee might resort to a tribunal in which a rule of decision prevails, or may prevail, differing from that of the court which is asked to enjoin the transfer, is sufficient to justify the interference asked.    The wrong sought to be prevented by such a proceeding is not any wrongful act of any party, but a decision of another court."

In the present case, there is not sufficient reason shown for resorting to an equitable action for the cancellation and destruction of these securities.    If the bonds are illegal and void then there is a complete defense at law, and equity will not and should not interfere.    The real purpose of this litigation seems to be to prevent a resort to the Federal courts for the determination of the validity of these bonds.    Certainly it is not the province or desire of this court to interfere for the purpose of preventing a resort to those courts, either for a decision upon that question, or for the enforcement of these obligations, on the ground that they may there be held to be valid or otherwise. As the authorities to which we have referred show, the power of a court of equity to decree surrender and cancellation of instruments for that cause has never been resorted to.    Neither justice

nor propriety would warrant this court in restricting parties holding obligations for which they have paid full consideration, from seeking their legal rights before any competent tribunal.

Nor do we consider the facts in this case sufficient to support the claim to equitable relief upon the other ground urged, — that of preventing a multiplicity of suits. The evil complained of is based more upon fear then reality. No vexatious litigation by any of these respondents has been shown. No evidence has been adduced of threats, even of vexatious suits. The mere allegation of a belief that the holders intend to harass the complainant is not sufficient. *Wilkes* v. *Wilkes*, 4 Edw. Ch. 630. The litigation that has taken place has been more strenuous to prevent the collection of the bonds than for the enforcement of them. The result of that ligitation has left no judgment that could legally be pleaded in bar, or as an estoppel, in a suit directly upon the bonds. At best, it is only by a course of reasoning that any judgment has affected the validity of them. With this result can it be said that any defendant in this suit is unreasonable and litigious because he still hopes eventually to collect the amount due? How can it be said that these defendants are in fault? On the other hand, from the complainant's own showing it was itself the author of the mischief complained of. It put in circulation the very bonds of which it now complains. The respondents, believing in their validity, paid their money for them. And this court is asked. to shield and protect the complainant from the expense and annoyance of proving the invalidity of its own acts in a suit at law, where such invalidity, if it exists, may properly be shown, by a cancellation and destruction of these obligations. The relief sought is. discretionary with the court; the complainant is not, as we have already observed, entitled to it as a matter of absolute right.

It is urged, in conclusion, that notwithstanding the court may decide adversely to the prayer of the bill, yet it should not be dismissed, but that having jurisdiction of the cause for any purpose it should be retained and a final determination made of all matters, and the rights of all parties be settled in this suit.

While this undoubtedly might be desirable for all parties, we

deem it preferable to leave them to their legal rights rather than review or call in question the decisions of this court upon the litigation which has arisen in relation to this controversy.

*Bill dismissed as to all the respondents who have appeared and answered, with costs.*

PETERS, C. J., WALTON, LIBBEY, EMERY and WHITEHOUSE, JJ., concurred.

VIRGIN and HASKELL, JJ., having been of counsel, did not sit.