# CHARLESTON

JACKSON v. STOCKERT *et al.*

Submitted November 17, 1914.    Decided January 14, 1915.

1.   CORPORATIONS—*Sale of Stock—Setting Aside—Fraud.*
       Equity has jurisdiction to cancel a sale of shares of stock in a corporation, fraudulently procured. (p. 483).

2.   SAME—*Sale of Stock—Rescission—Grounds—Representation of Fact.*
       False statements to the purchaser, by the seller of such stock, that he had paid in full therefor, and that the corporation had earned $15,000 net in the year preceding, which statements the purchaser believed to be true, and was thereby induced to buy the stock, is good ground for rescinding the sale. Such statements are repre- sensations of facts, and not of mere opinions. (p. 484).

   (ROBINSON and LYNCH, JUDGES, *dissenting.*)

Appeal from Circuit Court, Upshur County.

Suit by Charles F. Jackson and others against G. F. Stock- ert and others. From decree for defendants, plaintiffs appeal.

*Reversed and Rendered.*

*G. M. Fleming* and *C. C. Higginbotham,* for appellants.

*U. G. Young,* for appellees.

WILLIAMS, JUDGE:

Plaintiff purchased from defendant fifty shares of capital stock of the Buckhannon Water and Light Company, of the par value of $100 per share, paying therefor $5,000, its par

value.   This suit is brought to rescind the sale and recover back the purchase money on the ground that plaintiff was fraudulently induced to buy the stock by certain alleged false statements and representations made to him by defendant.   Plaintiff avers that defendant represented to him that he had paid in full for his stock and that he was the only stockholder who had paid in full; that the year before the plant had earned a clear profit of $15,000, and he thought it would make $20,000 that year.   He avers that he believed those statements to be true and was thereby induced to buy the stock, but that they were in fact false and untrue, and were known so to be by defendant at the time they were made.   He also avers that there was a mortgage indebtedness of about $85,000 upon the plant, of which he had no knowledge until after he had bought the stock, and offers to return the certificate of stocks on return of the purchase money with interest.   Defendant answered, specifically denying each allegation of the bill, plaintiff replied generally and depositions were taken by both parties, but before the cause was heard plaintiff departed this life.   The suit was then revived in the name of Charles F. Jackson and Edward W. Jackson, plaintiff's executors, and on the 30th December, 1912, was finally heard on pleadings and proof, and a final decree pronounced denying relief on the merits and dismissing the bill, and plaintiffs have appealed.

Jurisdiction in equity was challenged in the court below by demurrer, which the court properly overruled.   That equity jurisdiction exists in all cases where fraud is properly charged as the grounds for relief, is too well established to require argument, or citation of authorities.   But it is proper to state that counsel for appellee has abandoned his contention of want of equity jurisdiction, and in his brief admits it, provided the fraud is properly charged.   But he insists that the charges in the bill relate to matters of opinion merely, and do not constitute fraud even if they afterwards turned out not to be true.   But we do not think the matters charged as false and fraudulent relate to mere opinion.   Some of them relate to facts that either had, or had not, an existence at the time. We, therefore, think the bill states a good cause for relief in equity.

The question we have to consider then relates to the proof, the weight of evidence, depending chiefly, but not wholly, upon conflicting testimony of the two interested parties. They flatly contradict each other on the most material facts. Defendant was the owner of one hundred and forty shares of stock, was one of the organizers and a director of the corporation. He was also, at the time of the sale, and had been for some time before, its general manager. The corporation was a close one, composed of nine or ten stockholders, each having subscribed to ten thousand dollars of the capital stock, which was to be $100,000. Only a small part of the capital subscribed seems to have been paid into the treasury. At the time of the stock sale in question, there appears to have been an unpaid bond issue amounting to $80,500 or about that sum, secured by deed of trust on the company's plant. Plaintiff wished to make a permanent investment of $5,000 for the benefit of an infant daughter, and spoke a number of times to defendant about buying some stock in the Buck-hannon Water and Light Company. Defendant told him the stock was not for sale, and offered to sell him some bonds, but plaintiff said he did not want the bonds because they were liable to be paid off in a few years, and he wanted to make a longer investment. Defendant says the stockholders had agreed among themselves not to sell any of their stock to a stranger to the corporation. Frequent conversations were had between them, extending back over several months before the sale. Defendant says he never went to plaintiff to sell, but that plaintiff always came to him to buy. Plaintiff admits that he went to defendant, about a year before the sale when the company's books were first opened, and offered to buy stock, and says defendant told him it was all sold, and proposed to sell him twenty year bonds, but that he told him he did not want bonds. He further says: "that was the last conversation we had, until he came to my house and told me he had bought some stock and I could buy some stock, that he would let me have as a favor, as I had always been a special friend of his. That he had named it to the company and they asked him if I was a good man and he told them I was, and a special friend of his." Plaintiff says he did not know of the existence of the mortgage, but defendant denies this, and says

he explained the mortgage to him. But whether he did or not, plaintiff's own admission that defendant had previously offered to sell him bonds would seem to be enough to put him upon inquiry concerning the lien on the property. A corporation would hardly be offering its bonds for sale without first having secured them by a lien of some kind upon its visible property. Plaintiff was familiar with methods of business by corporations, he was a stockholder and director in a bank, and was interested as stockholder in a number of other corporations, and he would not likely be misled concerning a mortgage on the company's plant, when he knew its bonds were on the market. Whether the trust deed exhibited with the bill is the one then in existence, we are not able to determine. Plaintiff purchased the stock on 25th January, 1907, and the deed of trust, spoken of as a mortgage, bears date December 1, 1906, and was not recorded until 20th February, 1907, nearly a month after the stock transaction was had. It is not likely the company would be selling its bonds before the security was recorded. Furthermore, defendant himself says he does not think that deed of trust, or the proposed bond issue under it, was ever carried into effect. It may be, therefore, that the bonds that defendant proposed to sell, were bonds of another and previous issue; or they may have been bonds of the issue then contemplated, but never consummated. The record leaves that question in doubt.

Plaintiff swears that, at the time he bought the stock, defendant told him the plant had made a net profit of $15,000 in that year, (1906), after paying interest and all expenses; that in a year or two it would pay a big thing; that the reason no dividends had been declared was because the earnings had all been used to extend the water mains and increase the capacity of the plant; that he invited him to the office to inspect the company's books. He says he went to examine the books, but they could not be found; that plaintiff told him he had paid for all his stock and did not think any of the other stockholders had paid for theirs; that he believed those statements to be true; and that, if he had not believed them as true and relied on them, he would not have bought the stock. Defendant denies making some of those statements, and others he admits he made and insists that they are true.

The two which we think are material, as being statements of facts, and not mere matter of opinion, are (1) the statement that the plant had earned $15,000 net in 1906; and (2) that he had paid in full for his stock. Defendant denies having made the first statement, but admits making the second and insists that he had paid in full for all his shares of stock. The falsity of the first statement, if it was made, is virtually admitted. Defendant does not claim, in his testimony, that the net earnings of the plant, for the year 1906, amounted to much, and from other parts of the record it appears to have been only $39.61. But he denies that he made that statement. He swears he did not tell plaintiff what the net earnings were, but says he told him the gross earnings for that year were $19,700. Here is direct conflict between them, but we think a decided preponderance in the scale exists in favor of plaintiff. In the first place he is corroborated by his son Charles F. Jackson, who swears he was present when the deal was made and heard defendant tell his father the plant had earned $15,000 net. Defendant does not deny that plaintiff's son was present, but says, if he was, he has no recollection of it. Plaintiff and his son both swear that the son was present. Plaintiff says he asked his son to go along with him to examine the company's books, and that the books could not be found when they got to defendant's office. The testimony is also flatly contradictory concerning the place where the sale occurred. Defendant says it took place at plaintiff's house, whereas plaintiff and his son both say it was at defendant's office. However, the place is not material, but we mention it as showing the many points of conflict between them. Defendant does not deny that he invited plaintiff to inspect the books, and that when he came to his office, the books could not be found. His testimony on that point is as follows: "Q. Mr. Jackson also says among other things, you referred him to the books and that he was to come down town that day or the next day; that you told him to come down to your office and that you found the books were not there and that you called in his son Charlie Jackson and made a statement to him of the contract and the facts and why you could not get the books. I will ask you to state whether or not such conversation occurred between you? Ans. I don't remember of

anything of that kind ever occurring, and if Charlie Jackson was ever in my office in his life time I don't remember it. Ed has been in my office several times, but I don't remember of Charlie Jackson ever being in my office. Q. Did you close the deal in your office? Ans. No sir up at Mr. Jackson's house.'' Moreover, plaintiff and defendant both appear to have been experienced business men, and it is more consonant with reason that the conversation should have related to the net, rather than to the gross earnings, for the profit to the stockholders would be determined by the former and not by the latter. The gross earnings, however large they may have been, would not indicate actual earnings, unless the operating expenses had also been given, and defendant does not pretend that he told plaintiff what the operating expenses were.

Concerning defendant's claim that he had in fact paid for his stock in full, we do not think it is borne out by the record. He was general manager of the company, and superintended the erection of the buildings and the installation of its plant, and claims that, for those and other services rendered, he was paid in capital stock amounting to $14,000. But it appears from a statement of the company's accounts filed with his deposition, the correctness of which he admits, that his services in full to 1st December, 1906, were paid for with $4,000 worth of stock and two $500 bonds. He owned 140 shares, and he does not claim to have paid more than $1070 in money, the balance he claims to have paid in two and a half years services for which, he says, he was to be paid $100 per month, but for which the company allowed him only $70 per month. Some of his salary, he says, was paid in money and some in stock. When asked how much of his salary went into the $10,000 of stock for which he had subscribed, he replied that he did not then know exactly, and continuing his answer, said: ''When we first commenced building the plant we put in so much money and then they give me $100 a month salary that I paid on the stock and then give me so much stock extra as a gift; that all made up $10,000.'' His salary at $70 per month, for two and a half years, amounts to $2,100, to which, if we add the cash he paid in, $1070, we have $3,170. That is all he has proven he paid for 140 shares, of the par value of $14,000. But he does not claim to have been paid all his

salary in stock, some of it, he says, was paid in cash. Without detailing the evidence further, we think it is proven that defendant held 100 shares of stock in consideration of $1,070 cash paid in, and 40 additional shares for services rendered to the company. Only a small per cent of the par value of the stock appears to have been paid into the treasury of the company by any stockholder. Therefore, the statement he made to plaintiff, that he had paid for his stock in full, and that he was the only stockholder who had, was not true, and was misleading. It may be true that he paid a greater per cent on his stock than other stockholders, in that he seems to have paid in full, in services performed, for 40 of his 140 shares. The other stockholders appear to have paid in only about $1,070 on their several holdings of 100 shares of stock.

It is shown that some of the stock was sold at auction and brought a small price, which would indicate that it is not of much value, but that fact is not material. Plaintiff's right to relief does not depend upon the value of the stock, but upon the fact that he was fraudulently misled by defendant into buying it. The case is one which, in equity and good conscience, calls for relief. We reverse the decree complained of, and will enter such decree here as the lower court should have entered, decreeing plaintiff a recovery of the money paid, with interest thereon from the time of payment, on his surrendering to defendant the certificate of stock.

*Reversed and Rendered.*

LYNCH, JUDGE *(dissenting):*

As plaintiff had a complete and adequate remedy at law, no equitable grounds existed for the maintenance of this suit. Fraud, it is true, is one of the elementary grounds for jurisdiction in equity; but not all fraudulent conduct warrants relief in that forum. "The jurisdiction of courts of equity does not extend to all possible cases in which the commission of fraud may be involved. If the right invaded is legal, and the remedy at law full, adequate and complete, the concurrent jurisdiction in equity does not exist". *Buck* v. *Ward,* 97 Va. 209; *Kane* v. *Coal Co.,* 97 Va. 329. Where the fraud alleged results in an injury as a mere tort, equity will not take cognizance, but the injured party must resort to an

action at law. *Lumber Co.* v. *Parks,* 72 W. Va. 625. The cause for relief in that case was fraudulent misrepresentation of the quantity of standing timber upon a tract of land purchased by the plaintiff company. So, in *Laidley* v. *Laidley,* 25 W. Va. 525, it was held that, in the absence of other distinct grounds of equitable cognizance, a bill in equity is not maintainable to recover damages for false representations as to the subject matter of the negotiation. Equity can not award damages in any case where there is a clear remedy at law. *Meze* v. *Mays,* 6 Rand 660. Generally, courts of equity will not entertain a suit for damages, or compensation for wrongs or injuries cognizable at law, if these constitute the sole objects of the bill, as clearly in this case they do. 2 Story Eq. Jur. §794. The right to a decree for the consideration paid for water fund certificates secured by a deed of trust, on the ground of false representation as to the value of the securities, was denied in *Powell* v. *Louisville,* 141 Fed. 960. On facts somewhat similar, the court there said, what is entirely appropriate here: "The suit is in effect a bill in chancery to recover damages for false representation; or, perhaps more exactly fitting the purpose of the suit, to recover as in an action at law moneys had and received" by defendant for plaintiff's use and benefit, or as for fraud and deceit.

The fraud which gives rise to an action of deceit, exists where, as charged by the bill, "a person makes a false representation of a material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge when he does not know whether it is true or false, with intention to induce the person to whom it is made, in reliance upon it, to do or refrain from doing something to his pecuniary hurt; when such person, acting with reasonable prudence, is thereby deceived and induced so to do, or refrain, to his damage;  *  *  *  * and, as a general rule, whenever the facts bring a case within this definition, an action for damages will lie". 20 Cyc. 10. While courts of equity have concurrent jurisdiction with courts of law to give damages for fraud, and may entertain jurisdiction although plaintiff may have an adequate remedy by an action of deceit; yet, where plaintiff has a plain and adequate remedy at law, and seeks no relief peculiarly within

the jurisdiction of a court of equity, the court will ordinarily decline to entertain jurisdiction for the mere purpose of giving damages''. 20 Cyc. 94.

Damages sustained by reason of fraud can not be ascertained in a court of equity and decreed to the person injured. *Robertson* v. *Hogshead,* 3 Leigh 667. See also *Schwartz* v. *Bowler Mfg. Co.,* 177 Ill. App. 294. ''A court of equity of the United States will not sustain a bill in equity, in a case of fraud, to obtain only a decree for the payment of money by way of damages, when the like amount might be recovered in an action at law.'' *Buzard* v. *Houston,* 119 U. S. 347. The gravamen of the charge in the case last cited was fraudulent representation as to the solvency of the contracting party, and relief was denied ''because an action of deceit would afford a full, adequate and complete remedy''.

Relief in equity by restoration of the possession of a movable house, treated as personal property, on the ground that such possession was obtained by fraudulent representation as to the ownership of the patent on which was issued the stock transferred to the plaintiff in consideration for the house, was refused in *Wilson* v. *Maxon,* 56 W. Va. 194. In the opinion it is said: ''The allegations and proof are insufficient to overthrow the title of the Maxon-Miller Company to the patent involved, and, as this is really the only foundation for the charge of fraud or the want of consideration, the bill should have been dismissed. Not only is this true, but the plaintiffs, if showing a good case for relief, have a good and adequate remedy at law''. The rule is general that resort can not be had to a court of chancery for relief, even where fraud is charged, if plaintiff has as complete, effectual and adequate remedy in an action at law. *Green* v. *Spaulding,* 76 Va. 411; *Harvey* v. *Fox,* 5 Leigh 444. Save as ancillary or auxiliary to some recognized subject of jurisdiction, equity will not entertain a suit for damages, or undertake to award damages, and then only by way of compensation for the resultant injury. *Ewing* v. *Litchfield,* 91 Va. 575. Nor even where fraud in the procurement of a contract constitutes the meritorious cause of complaint will equity interpose the remedy by cancellation, if there is an adequate remedy at law. *Johnson* v. *Swanton,* 107 N. W. (Wis.) 481; *Farmington* v. *Bank,* 85

Me. 46. Later this doctrine was recognized in *Coal Co.* v. *Thomas*, 85 S. E. (W. Va.) 171, wherein the second point of the syllabus says: "Equity will not entertain a suit to cancel a contract for the sale of land solely on the ground that it was procured by false representations. In such case, the law affords full, adequate and complete remedy".

Where, as in this case, plaintiff's object manifestly is recovery of the amount paid for the shares of stock, he, as a matter of justice and right, should have been relegated to an appropriate action at law, where a jury would have had opportunity to determine as to his right to the return of the money invested in the shares of stock, and to express its opinion upon the charge of fraud imputed to defendant, as to whose guilt grave doubt exists. That was the proper forum for the determination of the issues involved. Plaintiff's remedy there was full, complete and adequate. 16 Cyc. 81.

Besides, while many cases deem imperative the requirement of an averment of want of adequate remedy at law (1 Enc. Dig. Va. & W. Va. Rep. 173), the bill in this case contains no such averment. On the contrary, it clearly shows the existence of a complete and adequate remedy by an appropriate legal action. Nor does plaintiff seek cancellation or rescission of the contract of sale and transfer of the shares of stock, on the ground of fraud or on any other ground. He merely offers to return the shares to defendant upon receipt of the money paid by him and the interest accrued thereon since the date of payment. Specifically, plaintiff prays that defendant "be decreed to pay back to him said five thousand dollars which he paid as aforesaid for said fifty shares of stock, with interest from the date of said payment", and for general relief. Thus, clearly, plaintiff's demand is limited solely to the restitution of the money paid in acquiring the certificates of stock in the power plant. He seeks no other relief, makes no other demand.

Did defendant misrepresent the value of the stock sold by him to the plaintiff? The prevailing opinion concedes that, on this feature of the case, the testimony of the plaintiff and that of the defendant is directly conflicting and wholly irreconcilable. But it is based on the assumption that the testi-

mony of the plaintiff's son and the audit of the company's accounts so far tend to corroborate the father as to discredit the evidence of the defendant. I am constrained to withhold assent to that conclusion. The testimony of the plaintiff is itself incoherent, unconvincing, inconclusive. He was an old man when examined as a witness in the case, and did not seem to have a clear conception of the plainest principles pertaining to corporate stock, though owning shares in several different corporations, in some of which he was or had been a director. Although alleging in his bill, and as a witness admitting, want of knowledge of the existence of a bonded indebtedness on the company's property, he said Stockert wanted to sell him some of the bonds in lieu of stock. Whether he admitted or denied such information, it is fully established by the testimony of Stockert and Moore.

Nor was the testimony of Charles F. Jackson, the son, entitled to the credit accorded to it by the opinion in this case. He was present only on one of the several occasions pending negotiations between his father and Stockert, and then but a few moments. Besides, he was not called as a witness until after the examination of the defendant. The questions propounded to the latter and the answers by him were repeated to the son by plaintiff's counsel, who asked the witness what he had to say about that; what was said about this? Was anything said about gross earnings? Generally the desired answers were either suggested or made apparent by the character of the questions propounded. They admitted only of categorical answers. But when asked on cross-examination to detail conversations heard by him, his only reply was: "Well, I don't know as I could say word for word. I could give you the substance of what I was called in for, and as Mr. Moore wasn't there and father was buying some stock of Mr. Stockert, the Water and Light Co.; and the books wasn't there, and I was just called in to hear the contract stated, which Mr. Stockert agreed to let father have $5,000 worth of Buckhannon Light and Water stock, that he didn't have all the money but could give the balance of it with due bills for part and his note for the balance, and the certificates should be issued as soon as he could notify Mr. Moore; that is about the substance of it". In this summary,

he says nothing by way of confirming the fraudulent representations on which plaintiff based his right to a decree for the restoration of the cost price of the stock certificate.

But it is claimed that the audit makes obvious the fact that Stockert had not, as claimed by him, paid for the shares held by him in the company. No witness in the least discredits Stockert's statement, in his answer to the bill and as a witness, that he paid in full to the company par value of the stock issued to him. None could deny its truth. Nor does the audit justify a conclusion to the contrary. He testifies that he gave four years' constant service to the construction and management of the company's property prior to the first day of January, 1907, every year of which except the first it yielded a net profit ranging from $2,300.51 for the year 1904 to $6,755.05 for the year 1906, in addition to the large expenditures for betterments; and that, although for the two succeeding years the net profit was only $39.61, the delinquency resulted not under his management but under the mismanagement of his successor. The majority erroneously, doubtless inadvertently, found the latter amount to be the net profits for the year 1906, when, as heretofore stated, they were approximately seven thousand dollars. Moreover, as this diminution in revenues occurred subsequent to the purchase by plaintiff, he can not justly rely on it as ground for relief. Besides, the audit shows the company was charged with $4,200, salary due Stockert; that sum, as manifestly appears, being credited to him on the purchase price of the stock, or at least it was not paid to Stockert. For this service, for money expended by him, for salary unpaid, and $1070 cash, his compensation was invested in company stock, part of which he sold and transferred to plaintiff. He frankly and fully, and I think satisfactorily, accounts for the entire face value of every one of the 140 shares of stock owned by him in the corporation. If other share-holders failed to pay for their stock, plaintiff can not complain; for in his bill and as a witness he admits that Stockert informed him of such failure. He was therefore not thereby misled or deceived, but purchased his shares cognizant of their delinquency.

Likewise, if made at all, defendant's representations as to the probable earnings for any annual period subsequent to

plaintiff's purchase, were merely the expression of an opinion, and not of an existing fact within the actual knowledge of any stockholder or other person interested in the concern. Such revenues were altogether problematical, depending upon uncertain contingencies, and safe and competent management, without which the business could not be successfully conducted. Such official direction of the company's affairs appears to have been wholly incompetent and unsuccessful. The responsibility for that condition was due as much to plaintiff's as to defendant's dereliction. Both were shareholders of the company's stock during such period.

Nor, as conceded, does a sale of shares at auction, had nearly four years subsequent to plaintiff's purchase, though at a merely nominal price, have any probative value as of the date of the first sale, especially when, as manifestly appears, the ownership of the shares sold at auction was doubtful and suspicious.

Upon this character of proof, the circuit court entered the decree denying relief; and, under the authority of *Wolf* v. *Bank*, 54 W. Va. 689; *Fisher* v. *Berwind*, 64 W. Va. 304; *Bradshaw* v. *Farnsworth*, 65 W. Va. 28, and *Baker* v. *Jackson*, 65 W. Va. 282, it should have been affirmed; because these cases hold that ''a decree based on evidence, especially when conflicting, will not be reversed unless plainly wrong''. In my opinion the decree justly can not so be characterized.

Judge ROBINSON concurs in this dissent.